RECORD NO. 15-1669

In The
# United States Court of Appeals
### For The Fourth Circuit

## In re: PROVINCE GRANDE OLDE LIBERTY, LLC, a/k/a Silver Deer Olde Liberty AA Lots, LLC,

*Debtor.*

---

## PEM ENTITIES LLC,

*Appellant,*

v.

## PROVINCE GRANDE OLDE LIBERTY, LLC,

*Defendant,*

and

## ERIC M. LEVIN; HOWARD SHAREFF,

*Creditors – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH

---

### REPLY BRIEF OF APPELLANT

---

Vicki L. Parrott
John Paul H. Cournoyer
NORTHEN BLUE, LLP
Post Office Box 2208
Chapel Hill, North Carolina  27515
(919) 968-4441

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

ARGUMENT ...........................................................................................................1

    I.     Contrary to the Appellees' assertion, the Settlement Agreement did not extinguish the debt under the Paragon Note ..............................3

    II.    The Appellees' statements regarding the alleged misappropriation from Lakebound are irrelevant to the debt recharacterization claim ......................................................................6

    III.   The Appellees' brief incorrectly applies the *Dornier* factors ...............8

CONCLUSION ......................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*,
    269 F.3d 726 (6th Cir. 2001) ................................................................8, 10

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006) ............................................................................8

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors
(In re Dornier Aviation (N. Am.), Inc.)*,
    453 F.3d 225 (4th Cir. 2006) ................................................................*passim*

*In re Cold Harbor Assocs., L.P.*,
    204 B.R. 904 (Bankr. E.D. Va. 1997) .............................................................8

## ARGUMENT

The Debtor[1] purchased the Franklin County Property in December 2009, financed by a $6,465,000 secured loan from Paragon. (J.A. at 1038-1078; J.A. at 1026, ¶ 19.) However, the value of the Franklin County Property declined, the Debtor was unable to sell lots, and it defaulted on its payment obligations under the Paragon Loan in July 2010. (J.A. at 1027, ¶ 22; J.A. at 886, ¶ 13.) In October 2011, Paragon directed the trustee under the Paragon Deed of Trust to commence foreclosure on the Franklin County Property. (J.A. at 885.) By that time, the value of the Franklin County Property had dropped to about 20% of the face value of the Paragon Loan (i.e., approximately $1.3 million). (J.A. at 900.) The affidavit of Paragon's officer states that "[a]t all times up to the execution of the Note Sale Agreement, Paragon intended to complete a foreclosure sale of [the Franklin County Property]." (J.A. at 885.) Therefore, at the time of the Note Purchase Agreement, the Debtor was deeply insolvent, and there was absolutely no value in the Franklin County Property beyond Paragon's secured debt.

Despite these undisputed facts, the Appellee characterizes PEM's purchase of the Paragon Loan as "a transparent effort by insiders to strip equity from the Debtor and prevent payment to the Plaintiff/Appellees." (R. at Appellees' Br., p.

---

[1] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Appellant's opening brief.

1

1.) This is inconceivable, since the Debtor's property, worth approximately $1.3 million, was encumbered by almost $7 million in secured debt. Thus, the Appellees, as the holders of disputed unsecured claims, were well "out of the money," and would have received nothing had Paragon foreclosed on the property. PEM's purchase of the Paragon Loan did not "strip equity" from the Appellees, as it simply acquired the debt from Paragon that was already in existence.

The Appellees' arguments also rely heavily on the fact that PEM's manager was Stanley Jacobson. At the time PEM bought the Paragon Note, Stanley owned 82.1% of PEM. (J.A. at 904-05, ¶ 28.) However, Stanley and Rhoda Jacobson held only a 4.84% membership interest in the Debtor, and were passive investors with no authority or control over the Debtor, its management, or business operations. (J.A. at 899, ¶ 4.; J.A. at 1032-33, ¶ 44.) As this Court stated in *Dornier:*

> We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006). PEM's purchase of the Paragon Note was not a new loan to the Debtor, but even if it was, Stanley

2

Jacobson's status as a passive, minority member of the Debtor would not be a sufficient basis for recharacterization.

It is undisputed that PEM purchased its claim from Paragon Commercial Bank, an outside lending institution. Applying the Fourth Circuit's *Dornier* factors to the transaction giving rise to the debt – which was Paragon's loan to the Debtor – establishes beyond any genuine factual dispute that PEM's claim is debt, not equity. Therefore, this Court should reverse the Bankruptcy Court's Order, and grant summary judgment in favor of the Appellant. However, at minimum, there are genuine issues of material fact, and the summary judgment order should be reversed and remanded to the Bankruptcy Court for further proceedings.

**I.    Contrary to the Appellees' assertion, the Settlement Agreement did not extinguish the debt under the Paragon Note.**

The Appellees argue that "PEM's supposed 'acquisition' of the $6.45 million Paragon Debt for $1.2 million was in substance a satisfaction of that note by the Debtor, not a third party transaction involving a bona fide buyer." (R. at Appellees' Br., p. 8.) In support of this argument, Appellees rely on a recital in the Settlement Agreement that Paragon, the Debtor and all other parties to that agreement "desire to settle and compromise all matters with respect to the . . . $6,465,000 Loan, including the Foreclosure [Action]." (J.A. at 527.) The Bankruptcy Court also relied on a five-word excerpt from Section 3.2(a) of the Settlement Agreement: "in settlement of the Loan." (J.A. at 528.) The capitalized

3

term Loan is defined to mean the Paragon Loan and a separate $1.2 million loan to another entity called CILPS Acquisition, LLC. (J.A. at 526.)

These two excerpts are scant evidence, at best, of the intention of Paragon and the Debtor to extinguish $7 million of secured debt, which Paragon then purported to sell to PEM. Indeed, the excerpts cited by the Appellees are contradicted by overwhelming evidence that eliminating the Paragon Loan was not the intention or effect of the Settlement Agreement. Paragon's officer, James Hoose, testified that "[a]t all times during the negotiation of the settlement agreement, Paragon intended to make no modification or compromise of the PGOL Note, the deed of trust securing that note, or any other obligation of PGOL related to its $6,465,000 debt." (J.A. at 887, ¶ 18.) Paragon's officer further testified:

> I am informed of a contention by Plaintiffs Eric Levin and Howard Shareff in this case that that a recital in the Settlement Agreement finally executed among Paragon, CILPS, Richard Wolf, Howard Jacobson, and PGOL had the intention of modifying, compromising, releasing, or reducing the obligations of PGOL under the PGOL Note and related documents. Paragon unequivocally did not intend the recital to have that effect or meaning other than to release a third lien on adjoining property [owned by CILPS] that the Bank deemed to have no equity.

(J.A. at 887, ¶ 19.) Similarly, the Debtor did not believe or intend that the Settlement Agreement would satisfy or reduce the Paragon Loan. (J.A. at 1030-31 ¶ 36; J.A. at 893, ¶ 23.)

4

The plain language of the Settlement Agreement is clear that the debt under the Paragon Note was not being extinguished or otherwise satisfied. Section 2.1 of the Settlement Agreement states that the balance owed on the Paragon Note is $6,419,750 plus accrued interest of $578,669. (J.A. at 527, § 2.1.) Section 3.1 states that the Debtor was in default under the Paragon Loan and that Paragon "has not waived, presently does not intend to waive, and may never waive any Existing Default and nothing contained herein or in the transactions contemplated hereby shall be deemed to constitute any such waiver." (J.A. at 527, § 3.1.) Section 3.3(a) repeats that Paragon "has not waived, is not by this Agreement waiving, and has no intention of waiving, any Event of Default under the Loan Documents." (J.A. at 534, § 3.3(a).) Section 3.2(a)(ii) states that Paragon "has postponed the foreclosure of the Deed of Trust securing the $6,465,000 Loan but Bank does not waive any right to proceed with the foreclosure and sale of the same." (J.A. at 528, § 3.2(a)(ii).) Section 3.3(d) states that all of the documents related to the Paragon Loan are "in full force and effect unless and until modified with the approval of [Paragon]." (J.A. at 535, § 3.3(d).)

Section 7.1 states that "[n]o other changes or modifications to the Loan Documents are intended or implied by this Agreement and in all other respects *the Loan Documents are hereby specifically ratified, restated and confirmed*." (J.A. at 536, § 7.1 (emphasis added).)

5

Section 7.4(d) states that "[n]otwithstanding any provision of this Agreement to the contrary, PGOL and the Guarantors of the $6,465,000 Loan acknowledge and confirm that *Bank is not releasing any of PGOL or the Guarantors with respect to the $6,465,000 Loan*." (J.A. at 537, § 7.4(d) (emphasis added).)

The Bankruptcy Court's Order does not mention or evaluate the testimony of Paragon's officer or the Debtor's representatives, or these provisions of the Settlement Agreement. The plain language of the Settlement Agreement establishes that it did not extinguish or otherwise satisfy the Paragon Loan. Therefore, the Bankruptcy Court should be reversed, and summary judgment should be entered in favor of the Appellant. At minimum, these provisions create triable issues of fact that preclude summary judgment for Appellees.

## II. The Appellees' statements regarding the alleged misappropriation from Lakebound are irrelevant to the debt recharacterization claim.

The Appellees' Statement of the Case contains numerous "background" assertions relating to the alleged misappropriation by Howard Jacobson or the Debtor of $188,000 allegedly belonging to Lakebound Fixed Return Fund LLC ("Lakebound"). The Appellees' claims regarding this alleged misappropriation are the subject of litigation pending before the North Carolina Business Court, and are irrelevant to the matter before this Court. The only issue in this case is whether or not the $6,465,000 loan made by Paragon in December 2009 and purchased by

6

PEM in March 2012 was properly recharacterized as equity in the Debtor. The Bankruptcy Court has not determined whether or not the Appellees hold valid claims against the Debtor, and its summary judgment opinion held that "[w]hether or not the Plaintiffs are entitled to a claim in the Debtor's case and to the relief set forth in this Order Granting Summary Judgment, will be determined in the trial of "*Bolton, et. al., vs Jacobson, et. al.*" in the North Carolina Business Court." (J.A. at 388.)

The Appellees' allegations related to Lakebound are irrelevant to the debt recharacterization claim. PEM did not even exist until December 2011. PEM had no involvement in the alleged transfer from Lakebound or the Debtor's purchase of its real property in December 2009, nor did PEM's manager, Stanley Jacobson. In fact, as set forth in Stanley Jacobson's affidavit, he had not even heard of Lakebound, Eric Levin, or Howard Shareff prior to the bankruptcy proceeding. (J.A. at 899.)

PEM's claim in the Debtor's bankruptcy case cannot be affected in any way by events allegedly occurring before PEM was created and in which Appellees do not allege PEM, Stanley Jacobson or Robert Conaty were involved. Therefore, the allegations related to Lakebound are irrelevant and should not be considered by this Court.

7

### III. The Appellees' brief incorrectly applies the *Dornier* factors.

In evaluating a claim for debt recharacterization, courts look to the transaction in which the debt was created, not any subsequent time period. *See Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation, Inc.)*, 453 F.3d 225, 232 (4th Cir. 2006) (holding that the determination of whether a debt should be recharacterized as equity "rests on the substance of the transaction giving rise to the claimant's demand"); *see also*, *e.g.*, *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006) ("[T]he focus of the recharacterization inquiry is whether 'a debt actually exists,' or, put another way, we ask what is the proper characterization in the *first instance of an investment*.") (internal citation omitted, emphasis added); *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-748 (6th Cir. 2001) ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [] *ab initio*'"); *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("the question before this Court is whether the transaction created a debt or equity relationship *from the outset*") (emphasis added).

The Appellees' argue that the Court should look at the Settlement Agreement in evaluating its debt recharacterization claim, even though it acknowledges that PEM was not a party to that agreement. (R. at Appellee's Br., p.

8

10.) In attempting to distinguish the caselaw cited above, the Appellees' misconstrue the difference between a claim for debt recharacterization, which is the claim before this Court, and a claim for equitable subordination, which is not. In fact, the Sixth Circuit specifically discussed the differences between debt recharacterization, which looks at whether the initial advance of funds was in the nature of debt or equity, and equitable subordination, in which a court can subordinate a legitimate debt claim based upon equitable factors. It noted:

> The effect of a bankruptcy's court's recharacterization of a claim from debt to equity may be similar to the court's subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of other creditors. However, there are important differences between a court's analysis of recharacterization and equitable subordination issues. Not only do recharacterization and equitable subordination serve different functions, but the extent to which a claim is subordinated under each process may be different. These are facts that the *In re Pacific Express* court appeared not to recognize. Recharacterization cases "turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim "to that of another creditor only to the extent necessary to offset injury or damage suffered by the

9

> creditor in whose favor the equitable doctrine may be effective."
>
> If a claim is recharacterized and, therefore "the advance is not a claim to begin with" and the creditor is not a legitimate one, "then equitable subordination never comes into play." Indeed, "where shareholders have substituted debt for adequate risk capital, their claims are appropriately recast as equity regardless of satisfaction of the other requirements of equitable subordination." Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading "some courts to equitably subordinate claims that other courts would recharacterize as equity contributions."

*Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 748-749 (6th Cir. 2001) (internal citations omitted).

A debt recharacterization claim is evaluated by determining whether the advance of money was debt or equity at the time it was made. The Appellees' misapply the *Dornier* factors in their brief by failing to apply them to the transaction in which the funds were actually advanced to the Debtor, which was Paragon's loan to the Debtor.

The Appellees' position relies at its core on the fact that the Paragon Loan was subsequently sold to an entity controlled by a member of the Debtor. This is a factor that could be evaluated in the context of an equitable subordination claim but is irrelevant to a debt recharacterization claim. Similarly, the Appellees' brief points to the fact that the proceeds from the Debtors' subsequent lot sales were

10

paid to PEM, which is not relevant to the question of whether the claim was in the nature of debt or equity when the funds were advanced.[2] Courts may look at subsequent events when evaluating an equitable subordination claim, but they are simply not relevant to a debt recharacterization claim.

The Settlement Agreement is not the document that established PEM's claim. PEM was not a party to the Settlement Agreement. More importantly, no money was advanced to the Debtor pursuant to the Settlement Agreement, so it could not possibly evidence any claim – whether debt or equity – against the Debtor.

The documents that created and evidence the claim held by PEM are the Loan Documents it purchased pursuant to the Note Sale Agreement. These documents are (i) a Commercial Note in the principal amount of $6,465,000; (ii) a first priority Deed of Trust and Security Agreement recorded in Book 1759, Page 190 of the Franklin County Register of Deeds; (iii) a Loan Agreement, and (iv) a Security Agreement. (J.A. at 1038-1078.) As set forth in the Appellant's opening brief, application of the *Dornier* factors to the Paragon Loan establishes that the funds were advanced to the Debtor in the context of a secured loan transaction with a commercial lender.

---

[2] Additionally, this argument ignores the fact that PEM was entitled to receive the sale proceeds under its deed of trust – as Paragon would have been had it not sold the debt.

11

However, even if this Court looked to subsequent events in evaluating the debt recharacterization claim, there would be multiple facts that support the conclusion that PEM's claim is debt, not equity. These include: (i) the fact that PEM acquired the debt by an "Agreement for Sale and Assignment of Promissory Note and Other Loan Documents," which plainly treats the claim as a loan, (ii) the fact that the Settlement Agreement specifically provided that the balance of the Paragon Note was almost $7 million and explicitly stated that "Bank is not releasing any of PGOL or the Guarantors with respect to the $6,465,000 Loan" (iii) the fact that PEM held a deed of trust to secure its claim, (iv) the fact that even after PEM acquired the debt, its secured claim was not subordinated to any creditor of the Debtor, and (v) the fact that there was a sharp disparity between Stanley and Conaty's membership interests in PEM (92.63% at the time the debt was purchased) compared to their membership interests in the Debtor (7.86%).

## **CONCLUSION**

The Bankruptcy Court's analysis, and the Appellees' brief, incorrectly treat the Settlement Agreement as the transaction establishing PEM's claim. However, no funds were advanced to the Debtor by PEM or its members pursuant to the Settlement Agreement, nor were any funds advanced to the Debtor in connection with PEM's purchase of the Paragon Loan under the Note Sale Agreement. Therefore, the Settlement Agreement could not possibly have been the transaction

giving rise to PEM's claim. PEM's claim is based upon the Paragon Loan documents it acquired under the Note Sale Agreement, and the funds advanced to the Debtor by Paragon Commercial Bank pursuant to those Loan Documents.

PEM's debt is for money loaned by Paragon Commercial Bank, an outside lending institution. The undisputed facts establish that this was a bona fide debt claim when the funds were advanced. Therefore, this Court should reverse the Bankruptcy Court's order, and summary judgment should be entered in the Appellant's favor with respect to the debt recharacterization claim.

Respectfully submitted on behalf of the Appellant, this the 22nd day of September, 2015.

        NORTHEN BLUE, LLP

        /s/ John Paul H. Cournoyer
        Vicki L. Parrott, NCSB #25449
        vlp@nbfirm.com
        John Paul H. Cournoyer, NCSB #42224
        jpc@nbfirm.com
        Post Office Box 2208
        Chapel Hill, NC 27515-2208
        Telephone: 919-968-4441

        *Counsel for the Appellant*

# **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ] this brief contains [*3,112*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: September 22, 2015              /s/ John Paul H. Cournoyer
                                       *Counsel for Appellant*

# **CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 22nd day of September, 2015, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

    James C. White
    Michelle M. Walker
    LAW OFFICES OF JAMES C. WHITE, PC
    Post Office Box 16103
    Chapel Hill, North Carolina  27516
    (919) 246-4676

    *Counsel for Creditors – Appellees*

I further certify that on this 22nd day of September, 2015, I caused the required copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

    /s/ John Paul H. Cournoyer
    *Counsel for Appellant*